1  Richard D. McCune (State Bar No. 132124)
   rdm@mccunewright.com
2  David C. Wright (State Bar No. 177468)
   dcw@mccunewright.com
3  **MCCUNE WRIGHT AREVALO, LLP**
   3281 E. Guasti Road, Suite 100
4  Ontario, California 91761
   Telephone:    (909) 557-1250
5  Facsimile:    (909) 557 1275

6  Emily J. Kirk, IL Bar No. 6275282*
   ejk@mccunewright.com
7  **McCUNE WRIGHT AREVALO, LLP**
   231 N. Main Street, Suite 20
8  Edwardsville, IL 62025
   Telephone:  (618) 307-6116
9  Facsimile:  (618) 307-6161

10  *Pro Hac Vice application to be submitted

11  Attorneys for Plaintiff Daniella A. Caveney
    and the Putative Class

12

13

14  **UNITED STATES DISTRICT COURT**

15  **NORTHERN DISTRICT OF CALIFORNIA**

16  DANIELLA A. CAVENEY, individually, and on       Case No.   3:20-cv-3028
    behalf of all others similarly situated
17                                                    **COMPLAINT FOR:**
                    Plaintiff,
18                                                    1.  Breach of Account Agreement
               v.                                     2.  Breach of Opt-in Agreement
19                                                    3.  Breach of the Implied Covenant of Good
    PATELCO CREDIT UNION, a California                    Faith and Fair Dealing
20  Corporation; and DOES 1 through 100,             4.  Unjust Enrichment/Restitution
    inclusive,                                        5.  Money Had and Received
21                                                    6.  Violation of the Electronic Fund Transfer
                    Defendants.                           Act (Regulation E, 12 C.F.R. §§ 1005, *et*
22                                                        *seq.*)
                                                      7.  Violation of the California Unfair
23                                                        Competition Law (Bus. & Prof. Code
                                                         § 17200, *et seq.*)
24
                                                      **CLASS ACTION**
25
                                                      **DEMAND FOR JURY TRIAL**
26

27

28

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

Plaintiff Daniella A. Caveney ("Plaintiff"), by her attorneys, hereby brings this class and representative action against Patelco Credit Union and DOES 1 through 100 (collectively "Patelco" or "Defendant").

## NATURE OF THE ACTION

1.     All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.     Plaintiff has brought this class and representative action to assert claims in her own right, and as the class representative of all other persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public.  Defendant wrongfully and without authorization, unilaterally and without warning, withdrew money from Plaintiff and the Class Members' share ("checking") accounts when it was not authorized by contract, regulations, or equities to do so. Defendant falsely claimed that the funds it unilaterally took from Plaintiff's account were properly assessed overdraft fees (a fee for a transaction item that was advanced and paid by Defendant on behalf of Plaintiff) or Non-Sufficient Funds ("NSF") fees (a fee for a transaction that was returned unpaid). That was not true.  Defendant was not authorized to assess or collect these supposed overdraft fees or NSF fees.

3.     This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*,  Defendant's policy and practice of unlawfully assessing and unilaterally collecting overdraft fees and NSF fees as set forth herein, in violation of its contract(s) with Plaintiff and the class, as well as regulations, statutes, and equities.

## PARTIES

4.     Plaintiff Daniella A. Caveney is a resident of California, and a member of Defendant at all relevant times.

5.     Based on information and belief, Defendant is and has been a state-chartered credit union with its headquarters located in Dublin, California.

2

6.    Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of defendants DOES 1 through 100.

7.    Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or the Court.

8.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

9.    At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

11.    As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs; there are more

than 100 putative class members defined below; and there are numerous members of the proposed class who are citizens of a state different from Defendant.

13.    Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b), because Defendant's headquarters is located here and it regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## BACKGROUND

### DEFENDANT

14.    Defendant is a credit union with approximately 37 branches.  According to its website and financial filings, Defendant is one of the largest credit unions in the nation, with over 360,000 members nationwide, 770 employees, and holding over $7 billion in assets.  Defendant serves communities across Northern California, including the Bay Area, Sacramento and San Jose, as well as the employees of over 1,100 large and small businesses throughout the United States.  It describes its philosophy as "People, Not Profits." https://www.patelco.org/history-and-vision; https://www.patelco.org/ [last viewed April 30, 2020].  It markets and sells itself as superior to banks, in no small part through claims that it is not motivated by profit, but instead by service to its member owners.  As will be discussed in the following, that statement is false relating to its overdraft practices.

### CHECKING ACCOUNTS DEFENDANT OFFERS TO MEMBERS

15.    One of the main services Defendant offers to its members is a checking account.  The checking account can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at the branch; and deposits at ATM machines.  Debits decreasing the amount in the checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases.  Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.  As of December 31, 2019, Defendant reported holding 246,932 checking accounts with a total balance of

4

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

1  $1,072,336,553.

2  **CHECKING ACCOUNT OVERDRAFT AND NSF FEES GENERATE SIGNIFICANT PROFIT**

3  **FOR THE DEFENDANT**

4    16. In connection with its processing of debit transactions (debit card, ATM, check, ACH,

5  and other similar transactions), Defendant assesses overdraft fees (a fee for paying an overdrawn item)

6  and NSF fees (a fee for return of an item due to an overdrawn account) to member accounts when it

7  claims to have determined that an account has been overdrawn. While Defendant does not publicly

8  disclose the amount of overdraft fees and NSF fees it collects from its members, in 2019 it reported

9  collecting from all members $19,777,407 in services fees.  Based on information and belief, a significant

10  portion of those service fees consist of overdraft fees and NSF fees and are collected from a small

11  percentage of the overall credit union members.

12  **THE DETRIMENTAL EFFECT OF OVERDRAFT AND NSF FEES**

13    17. This case is about when and under what circumstances Defendant may charge an

14  overdraft or NSF fee.  The underlying principle for charging overdraft fees is that when the credit union

15  pays a transaction by advancing the credit union's own funds instead of using a member's insufficient

16  funds, it may charge a *contracted* fee, provided that charging the fee is not prohibited by some legal

17  regulation. The fee Defendant charges here constitutes very expensive credit. According to the FDIC:

18
19      For almost all study population banks operating an automated overdraft
    program, the main fee associated with the program was an NSF usage fee.
    Usage fees reported by these banks ranged from $10 to $38; the median
20      fee was $27, charged on a per-transaction basis in almost all cases. **In this**
    **context, a $27 fee charged for a single advance of $60 that was repaid**
21      **in two weeks roughly translated into an APR of 1,173 percent.**  Many
    surveyed banks (24.6 percent) assessed additional fees on accounts that
22      remained in negative balance status in the form of flat fees or interest
    charged on a percentage basis.

23  FDIC Study of Bank Overdraft Programs, 2008,

24  https://www.fdic.gov/bank/analytical/overdraft/fdic138_report_final_v508.pdf [last viewed April 22,

25  2020] (emphasis added).

26    18. Overdraft and NSF fees constitute a primary revenue generator for banks and credit

27  unions.  According to one banking industry market research company, Moebs Services, banks and credit

28  unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.  Moebs Services, *Overdraft*

*Revenue Inches Up in 2018* (March 27, 2019),

http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018

%200032719-1.pdf?ver=2019-03-27-115625-283 [last viewed April 22, 2020].  A 2010 report by

Georgetown University Law Professor Adam Levitin concluded that overdraft fees comprise 6% to 7%

of the gross revenue of credit unions.  Filene Research Institute Report, Overdraft Regulation A Silver

Lining In The Clouds? (Filene Research Institute 2010), https://ssrn.com/abstract=1544888 [last viewed

April 22, 2020].

19.     While credit unions portray themselves as more overdraft and fee friendly than banks—

and that may have been historically true—it is not true now.  Moebs Services reported that 2018 credit

union overdraft revenue jumped $500 million, even as bank overdraft revenue declined by $400 million.

Further, the same study showed that credit unions generated significantly more revenue per customer in

service fees than banks did.  *See* Credit Union Times, *Overdraft Revenue Surges at Credit Unions:*

*Moebs* (Jan. 7, 2019), https://www.cutimes.com/2019/01/07/overdraft-revenue-surges-at-credit-unions-

moebs/ [last viewed April 22, 2020].  And none of this is any surprise, because from 2000 to 2017 the

average credit union overdraft fee increased from $15 to $29.  MarketWatch, *The Average Credit Union*

*Overdraft Fee Has Almost Doubled Since 2000* (March 27, 2017)

https://www.marketwatch.com/story/credit-unions-charge-almost-as-much-as-major-banks-in-overdraft-

fees-2017-03-24 [last viewed April 22, 2020].

20.     Defendant's financial filings and practices reveal that it has followed these trends to the

letter.  Defendant charges an overdraft fee of $28 per item it claims is paid into overdraft.  Even if

Defendant had been properly charging overdraft fees, the $28 overdraft fee bears no relation to the credit

union's minute risk of loss or cost for administrating the Defendant's overdraft services.  Nevertheless,

the practical effect of the fee is to charge those who pay it an interest rate with an APR in the thousands.

21.     Accordingly, the overdraft fee is a punitive fee rather than a service fee, which makes it

even more unfair because most account overdrafts are accidental and involve a small amount of money

in relation to the fee. Further, in a 2012 study, more than 90% of customers who were assessed overdraft

fees overdrew their accounts by mistake.  Pew Charitable Trust Report, *Overdraft America: Confusion*

*and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

1 /media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf [last viewed April 22,

2 2020].  More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.

3 Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-

4 /media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf [last viewed April 22, 2020].

5 More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft

6 program, *id*. at p. 5, and more than two-thirds of customers would have preferred the financial institution

7 decline their transaction rather than being charged a very large fee, *id*. at p. 10.

8       22.    Finally, the financial impact of these fees falls on the most vulnerable among the banking

9 population with the least ability to absorb the overdraft fees.  Younger, lower-income, and non-white

10 account holders are among those most likely to be assessed overdraft fees.  *Id*. at p. 1.  A 25-year-old is

11 133% more likely to pay an overdraft penalty fee than a 65-year-old.  *Id*. at p. 3.  More than 50% of the

12 customers assessed overdraft fees earned under $40,000 per year.  *Id*. at p. 4.  And non-whites are 83%

13 more likely to pay an overdraft fee than whites.  *Id*. at p. 3.

14 **ACCOUNTING TRICKS TO CHARGE OVERDRAFT AND NSF FEES ON AN ACCOUNT**

15 **WITH SUFFICIENT FUNDS TO PAY A TRANSACTION**

16       23.    As a matter of background and to understand the banks' and credit unions' improper

17 overdraft practices, the various balances affecting customer checking accounts must be understood.

18 Either unknown to customers, or confusing even if known by customers, there are three balances

19 associated with a checking account: the "balance;" the "collected available balance;" and, the artificial

20 "available balance."

21       24.    Not all these balances are equal.  There is one official and real balance.  It is often

22 referred to just as "balance," or a credit union may call it "actual balance," "current balance," or "ledger

23 balance."  Whatever it is called, it is the money actually in the account without bookkeeping adjustments

24 for either upcoming authorized charges or holds the credit union may place on deposits already made

25 and placed in the account.  It is the official balance of the account.  It is the balance provided to

26 members in monthly statements, which are the official records of any account's activity.  It is the

27 balance used to determine interest on deposits and any minimum balance requirements.  It is the balance

28 used by Defendant to report its deposits to regulators, shareholders, and the public.  It is the balance

used in financial reports to shareholders and the balance used for internal financial reporting. And it is the balance used by credit reporting agencies when they decide Defendant's credit ratings.

25.     The "collected balance" or "collected funds balance" is the "balance" less holds placed on certain deposits pursuant to the financial institution's "Funds Availability Policy" ("FAP").

26.     The "available balance" is a completely different calculation from the "collected balance" or the real "balance." It is an artificially created internal risk management calculation developed to determine which transactions to process and which to return in line with likely upcoming debit charges and deposits that did not clear the bank's or credit union's FAP.

27.     Over time, as credit unions jumped on the overdraft train for revenue purposes, they decided to use their internal and artificial "available" balance not only for their legitimate use of managing pay or return decisions based on activities that it anticipated in the future, but also to assess overdraft and NSF fees on this artificial balance, rather than the real "balance." Generally, the result is that 10-20% of overdrafts fees are assessed on transactions where sufficient money was in the account and thus it should not have been considered overdrawn.

28.     This practice is not only unfair on its face, but more important for this case, Defendant did not contract with Plaintiff to authorize it to charge overdraft or NSF fees on transactions when the account had sufficient money to cover a transaction. In fact, until Defendant recently changed its account agreement in anticipation of this lawsuit, Defendant's agreement with members specifically stated that such fees would be assessed only when there was insufficient money in the account to cover the transaction ("balance"). Defendant did not contract with its members to use the artificial "available balance" for assessing overdraft and NSF fees.

**REPEAT FEES ON A SINGLE RETURNED TRANSACTION ALSO JUICES PROFITS**

29.     Charging overdraft and NSF fees when there is money in an account to cover a transaction is just one way that banks and credit unions manipulate checking accounts to increase profits. They also contract and disclose to customers that they will only charge a single NSF fee when they opt to return a check or ACH due to a lack of funds in the account. But in practice, they charge multiple NSF fees on the same item and attempt to justify the practice as caused by a merchant submitting the same item for payment multiple times.

8

30.     The CFPB has noted that, as opposed to overdraft program coverage, financial institutions' return of items as unpaid, which often results in the assessment and collection of insufficient funds fee charges (which the CFPB refers to as "NSF fees"), confers little, if any, benefit to consumers:

> An important consumer outcome of any overdraft program is the percentage of negative transactions that are paid (*i.e.*, result in overdrafts) or returned unpaid (*i.e.*, were NSFs). Paying overdraft transactions may confer some benefit (in exchange for the associated fees and other costs) to consumers by helping them make timely payments and avoid late penalty fees and/or interest charges from a merchant or biller. **In contrast, returning an item generally confers little benefit to the consumer (other than perhaps deterring future overdrafting and any subsequent consequences) and can result in an NSF fee as well as additional related fees, such as a returned check fee charged by the institution to whom the check was presented or a late fee charged by the entity to whom payment was due**.

CFPB, CFPB Study of Overdraft Programs (June 2013), p. 26 (internal footnote omitted) (emphasis added), https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf [last viewed April 22, 2020].

31.     Not only is this an unfair charge, it is not authorized by banks and credit unions' contracts with customers.  Those contracts do not disclose or permit the charging of multiple NSF fees based on the same transaction with the same merchant.  Instead, the agreements identify an NSF fee as being singular on a per transaction, or item, basis.

## THE REGULATORY RESPONSE TO THE HARM CAUSED TO CUSTOMERS BY OVERDRAFT AND NSF FEES

32.     In response to financial institutions' use of overdraft and NSF fees as profit centers at the expense of vulnerable customers, the federal government stepped in to provide additional protections to customers with respect to overdraft policies.  The regulations relevant to overdraft fees are found in the Truth in Savings Act ("TISA") directed specifically at credit unions found at 12 C.F.R. § 707.1, *et seq.* and the Electronic Fund Transfer Act ("Regulation E"), 12 C.F.R. § 1005.1, *et seq*.

## TISA REQUIREMENTS

33.     The purpose of TISA is to allow credit unions and potential members to make informed decisions about accounts.  12 C.F.R. § 707.1(b).  Disclosures must be presented in a format allowing

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

members to readily review the terms of the account and use consistent terminology to describe terms, which would include the overdraft terms in the account disclosure, fee agreement and monthly statements. 12 C.F.R. § 707.3.

34.     When a credit union promotes the payment of overdrafts in advertisements, it must do so accurately, clearly, and conspicuously. 12 C.F.R. § 707.8; 12 C.F.R. § 707.11 (b). In its account disclosure, a credit union must specifically authorize the fee it is charging, 12 C.F.R. § 707.4(b)(4), and it must *list the conditions* under which the fee may be imposed. *Id*. (emphasis added). It must also list the various types of transactions that may be subject to an overdraft. 12 C.F.R. § 707, App. C.

35.     Defendant has violated TISA in regard to Plaintiff by, among other things, providing inaccurate disclosures and agreements and failing to clearly and conspicuously identify its true overdraft practices.

## REGULATION E REQUIREMENTS

36.     In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions **only** if the institution first obtained the customer's affirmative consent. 12 C.F.R. § 1005.17 (Regulation E's "Opt-in Rule"). The special treatment provided for these transactions was supported by the Consumer Financial Protection Bureau's ("CFPB") study of actual practices that found: 1) ATM and debit card transactions are by far the most frequently-occurring transactions; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts. CFPB, *Data Point: Checking Account Overdraft,* (July 2014), https://files.consumerfinance.gov/f/201407_cfpb_report_data-point-overdrafts.pdf [last viewed April 22, 2020].

37.     The Federal Reserve's regulations specified what credit unions and banks had to do in order to comply with Regulation E and charge overdraft fees on one-time debit card and ATM transactions. They must obtain affirmative consent from the customer to charge the fees, and the affirmative consent must be obtained strictly in compliance with the Regulation E requirements. First, the customer must be provided the Opt-in Agreement before agreeing to opt-in. To qualify as affirmative consent, the Opt-in Agreement must accurately describe the overdraft program and include

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

specific features of the overdraft program, including the standard overdraft practice and the enhanced overdraft program for debit card and ATM transactions.

38.    When the customer is provided with the Opt-in Agreement, it must be presented as a standalone document and consent must be obtained separately from other consents and acknowledgements.  The customer's consent cannot serve any purpose other than opting into the overdraft program. The consent cannot be given through a default, pre-selected, checked box and the financial institution may not provide different terms for the account depending on whether or not the customer opted into the overdraft program.  Finally, the customer's affirmative consent must be documented either with the customer's signature, or by mailing the customer a confirmation that he or she opted in pursuant to their request 1) after being provided the Opt-in Agreement and 2) after being notified of the option to opt-out at any time.

39.    If the financial institution fails to obtain proper, affirmative consent from the customer in a manner that meets all of Regulation E's Opt-in Rule requirements, it may not charge overdraft fees on ATM and one-time debit card transactions.

40.    Here, Defendant utilized an Opt-in Agreement that misinformed members about both the standard overdraft policies and the Regulation E specific overdraft policies by falsely stating that overdrafts were assessed only when there was not enough money to cover the transaction and Defendant paid the overdrafts (actual "balance") when instead the Defendant used the bookkeeping artificial "available balance" to assess overdraft fees.

**HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THEIR USE OF AVAILABLE BALANCE TO ASSESS OVERDRAFT AND NSF FEES IN THE ACCOUNT AGREEMENT**

41.    Financial institutions have the ability to contract and disclose their actual practice of assessing overdraft and NSF fees on the artificial "available balance" rather than the actual "balance." Other banks and credit unions have done so.

42.    For example, Affinity Federal Credit Union's account agreement states, in bold, that "[a] temporary debit authorization hold affects your account balance."  The language beneath this header explains that "the amount of funds in your account available for other transactions will be reduced by

the amount of the temporary hold."

43. Likewise, GTE Federal Credit Union's account agreement contains the following language:

> YOUR CHECKING ACCOUNT BALANCE: . . . Any purchases, holds, fees, charges, or deposits made on your account that have not yet posted will not appear in your actual balance . . . . Your available balance is the amount of money in your account that is available to you to use without incurring an overdraft or NSF fee.  The available balance takes into account things likes holds placed on deposits and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but have not yet posted to your account . . . .

44. Logix Credit Union has also adopted an account agreement specifically stating debit holds can cause overdrafts:

> The available balance takes into account things like holds placed on deposits and payments that have been authorized but have not yet posted to your account (such as pending debit card purchases). For example, assume you have an actual balance of $50 and an available balance of $50. If you were to swipe your debit card at a restaurant to buy lunch for $20, then that merchant could ask us to pre-authorize the payment. In that case, we will reduce your available balance by $20. Your actual balance would still be $50 because this transaction has not yet posted, but your available balance would be $30 because you have committed to pay the restaurant $20. When the restaurant submits the transaction to us (which could be a few days later), we will post the payment transaction to your account and your actual balance will be reduced by $20.

45. Baxter Credit Union has an account agreement stating that "[a]vailable balance is used to determine when there are insufficient funds to pay an item presented for payment from the account" and describes the available balance as:

> generally equal to the actual balance, less the amount of any holds placed on recent deposits, holds for other reasons, and holds for pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account.

46. Southland Credit Union's account agreement also states that for purposes of determining whether to assess an overdraft fee, it:

> takes into account factors such as holds placed on deposits and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account.

47. Similarly, State Employees Credit Union of Maryland discloses that for purposes of assessing an overdraft fee, it:

12

> takes into account things such as holds placed on deposits and decreases in your Available Balance (such as pending debit card purchases) that you initiated and SECU has authorized but that have not yet posted to your account.

48.    MidFlorida Credit Union has also put forward a separate Overdraft Agreement which states that it:

> takes into account things like holds placed on deposits and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account.

49.    Point Loma Credit Union explains in its account agreement that for purposes of assessing overdraft fees:

> [a]ny purchases, holds, fees, other charges, or deposits made on my account that have not yet posted will not appear in my actual balance.

50.    San Diego County Credit Union's account agreement states that in determining whether an overdraft fee will be assessed against a member, "[w]e will consider all transactions that have posted to your account, any holds that may be in place on deposits you have made, and pending transactions (such as pending debit card purchases) that the Credit Union has authorized but that have not yet posted to your account."  It also contains a section on authorization holds, titled, "Authorization Holds for Debit Card Transaction," which states:

> [w]e generally place a temporary hold against some or all of the funds in the account linked to your debit card if and when an authorization request is obtained, [and that] [t]he amount of the authorization hold will be subtracted from your available balance."

## **HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THAT A SINGLE NSF ITEM CAN RESULT IN MULTIPLE OVERDRAFT FEES**

51.    Similarly, banks and credit unions have been able to properly contract and disclose the practice of charging multiple fees for the representment of the same item.  For example, Air Academy Federal Credit Union clearly states: an NSF fee is "$32.00 **per presentment**."

52.    Central Pacific Bank contracts unambiguously:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

13

53.     Delta Community Credit Union states its NSF fee is "$35 **per presentment**."  Further, in its Account Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account.  **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

54.     Glendale Federal Credit Union lists its NSF fee as "$30 **per presentment**."

55.     First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representation).  **Each presentment is considered an item and will be charged accordingly**."

56.     First Northern Credit Union lists its NSF fee as "$22.00 per each presentment and any subsequent presentment(s)."  Further, in its Account Agreement, First Northern unambiguously states as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**.  For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again.  If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item.  You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once.  **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**.

57.     Liberty Financial states its NSF fee is "27.00 **per presentment**."

58.     Los Angeles Federal Credit Union lists its NSF fee as "$29 **per presentment**."

59.     Members First Credit Union states:

> We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason.  **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representation** . . . .

60.     Meriwest Credit Union lists its fee as "$35.00/item **per presentment**."

14

61.   Partners 1ˢᵗ Federal Credit Union states:

> Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**.  Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

62.   Regions Bank states:

> If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item.  **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

63.   Tyndall Federal Credit Union lists its NSF fee as "$28.00 **per presentment** (maximum 5 per day)."

## HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THEIR USE OF AVAILABLE BALANCE RATHER THAN THE ACTUAL BALANCE TO ASSESS OVERDRAFT FEES IN THE REGULATION E OPT-IN AGREEMENTS

64.   Numerous credit unions and banks that utilize the artificial "available balance" rather than the money in the account ("balance") to assess overdraft fees contract and affirmatively disclose this practice in their Opt-in Agreements.  As just one example, TD Bank's Opt-in Agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway.  Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy."

65.    As another example, Credit Union 1, a credit union with over 87,000 members, states in its Opt-in Agreement, "[a]n overdraft occurs when you do not have enough available money (i.e., less any holds) in your checking account to cover a transaction, but we pay it anyway."

66.    Similarly, Communication Federal Credit Union's Opt-in Agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway.  **'Available Balance' is your account**

15

**balance less any holds placed on your account."** (Emphasis added.)

67.     Further, the Opt-in Agreement for San Diego County Credit Union, recognizing that "available balance" is at best an ambiguous term, explains on the same page, as follows: "In determining the available balance in your account, **we will consider** all transactions that have posted to your account, **any holds that may be in place on deposits you have made and pending transactions (such as pending debit card purchases) that [have been] authorized but that have not yet posted to your account."** (Emphasis added.)

68.     The Opt-in Agreement for EECU explains for five-pages on the same form requiring signature pursuant to Regulation E for overdraft coverage, including on page two, that "Your available balance takes into account holds that have been placed on deposits and pending transactions (such as pending debit card transactions) that the credit union has authorized but that have not yet posted to your account.  **In other words, the available balance is your actual balance less any pending ATM withdrawals, debit card purchases, ACH transaction, checks being processed or other pending withdrawals from your account and less any deposits that are not yet available due to the credit union's Funds Availability Policy."** (Emphasis in original.)

69.     There are countless other examples of financial institutions accurately explaining the basis for imposing overdraft fees in their Opt-in Agreements.  Financial institutions can accurately describe their overdraft programs in their Opt-in Agreements and Regulation E does not preclude them from doing so.  When they fail to accurately describe, mislead, or misrepresent their overdraft policies in their Opt-in Agreements, financial institutions breach those as well as violate Regulation E.  Further, financial institutions that fail to comply with other requirements of Regulation E's Opt-in Rule as laid out in Paragraphs 36-40, *supra*, have not obtained the affirmative consent needed to assess overdraft fees as governed by Regulation E.

70.     The importance of transparent checking account fee disclosures for both comparison shopping prior to opening an account, and avoiding overdraft and other fees after opening an account, are foremost:

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

> Bank accounts are an essential financial product, used by 9 in 10
> American households, and need to be safe and transparent. Account
> agreements and fee schedules provide customers with account costs,
> terms, and conditions. Among the largest U.S. banks, however, the
> median length of checking account disclosure documents is 40 pages, and
> the information is presented in varied formats with inconsistent wording,
> making it difficult for consumers to easily find the information they need
> to comparison shop, avoid overdraft and other fees, and manage their
> money.

The Pew Charitable Trusts, *The Benefits of Uniform Checking Account Disclosures,* at p. 1 (Nov. 2015),

(internal footnotes omitted), https://www.pewtrusts.org/-

/media/assets/2015/11/consumerbanking_accountdisclosurebrief.pdf  [last viewed April 22, 2020].

Accordingly, courts have come down heavy on banks and credit unions that have failed to accurately

describe and misrepresent their overdraft and NSF fee practices.

## **FACTUAL ALLEGATIONS AGAINST DEFENDANT**

71.    At all relevant times, Defendant has had an overdraft and NSF fee program in place

which, *inter alia*, is: 1) contrary to the express and implied terms of its contracts with members;

2) contrary to Defendant's representations about its overdraft and NSF fee program to its members; and

3) contrary to its members' expectations regarding the assessment of such fees.

72.    Defendant entered into a uniform written contract with Plaintiff and the other Class

Members titled "Member Handbook" (hereinafter "Account Agreement"). (The Account Agreement

attached hereto as Ex. 1, dated June 1, 2013, is believed to be one of the operative agreements during the

class period and representative of the account agreements in the class period.) The Account Agreement

promised that Defendant would not charge overdraft or NSF fees for any type of transaction when there

was enough money in the account to pay for the transaction. It stated in a section called "Overdrafts"

and a subsection called "Overdraft Protection Plans": "If there isn't enough money in your Checking

Account to cover the checks you write, or to cover transactions by you or authorized users of your

electronic transfer devices . . . we will handle the item as follows." It then goes on to state how it will

apply funds to cover items "when your checking account does not have sufficient funds to cover them."

Then, in a subsection titled "Discretionary Overdraft Services (Standard Overdraft Practices), it further

stated: "If you do not have sufficient available Overdraft Protection Plan funds from an authorized ODP

source, we will apply our standard overdraft practices. Under standard overdraft practices, we may at

1   our sole discretion return or decline the item, or pay it from our own funds."  In other sections through

2   the Account Agreement, Defendant described an overdraft as occurring when an item would "overdraw

3   your account," when there was a "negative balance," or when you "fall below a zero balance."

4       73.     The language "isn't enough money," "overdraw your account," "negative balance," "fall

5   below a zero balance," and "does not have sufficient funds" refers to the "balance," or, all of the money

6   in the account.  In other words, the Account Agreement did not authorize Defendant to assess an

7   overdraft or NSF fee—because an overdraft or NSF situation had not occurred—unless there was a

8   negative account balance, or a transaction exceeded the account's actual balance.  Nowhere did the

9   Account Agreement state that to determine whether there was money in an account to cover a

10  transaction, Defendant would not look to the actual amount of money in the account but, instead, to the

11  money in the account only ***after deducting holds placed on deposits and after also deducting holds***

12  ***placed on pending debit card transactions.***  Despite the Account Agreement's express language,

13  Defendant charged overdraft or NSF fees not based on the money in the account, but instead based on

14  the money in the account after deducting for deposit holds and pending debit transactions (the artificial

15  "available balance").

16      74.     The Account Agreement, at most, stated in a separate section pertaining to deposits rather

17  than overdraft and NSF fees, that temporary holds might be placed on certain deposited items before

18  they could be withdrawn (the "collected balance").  But this section did not state that such holds could

19  result in fees, and it certainly did not state the holds placed on funds earmarked for pending debit card

20  transactions (the artificial "available balance") could result in an overdraft or NSF fee.

21      75.     Here, Defendant charges expensive overdraft and NSF fees when the artificial "available

22  balance" is negative but the balance contains as much or more money than has been requested.

23  Defendant's practice of charging overdraft and NSF fees, even when there is enough money in the

24  account to cover a transaction presented for payment, is inconsistent with the Account Agreement.  And

25  Defendant's practices are inconsistent with its representations to its members, including where

26  Defendant has told members that its philosophy is "People, Not Profits."  This is despite the fact that

27  Defendant charges a $28 fee that is in no way related to an overdraft, given that a $3.34 transaction can

28  result in a $28 fee, the exact circumstance Plaintiff experienced on April 4, 2018.

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

76.     In or around September 2018, Defendant changed its Account Agreement purportedly for the purpose of changing its contract terms as to when and how it would charge an overdraft or NSF fee. (*See* Account Agreement, September 1, 2018, Ex. 2.)  Based on information and belief, the new September 2018 agreement changed language to now state that Defendant would place holds on pending debit card transactions and thereby reduce the balance available for purposes of assessing when an overdraft or NSF fee would occur, and it specifically defined "available balance" in this manner to account for holds on pending debit card transactions and holds on deposits.  On information and belief, not only did such terms not exist in the prior versions of the Account Agreement but, as stated, Defendant did not even imply that a hold might be placed on pending debit card transactions to reduce the balance in the account to an artificially lower one for purposes of assessing an overdraft or NSF fee.

77.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

78.     Meanwhile, Plaintiff and the Class Members could not have reasonably anticipated the harm resulting from Defendant's practice throughout the class period.  The money in the account, without deductions for holds on pending transactions or on deposits, as already stated, is known as the "balance," and is considered the official balance of the account.  It is the balance provided to members in monthly statements, which is the official record of activity in the account.  It is the balance Defendant uses to determine interest on deposits and any minimum balance requirements; the balance Defendant uses to report its deposits to regulators, shareholders, and the public; the balance Defendant provides to regulators in call reports and reserve reports; the balance Defendant uses in financial reports to shareholders; and the balance Defendant uses for internal financial reporting.  When Defendant refers to "balance" or "funds" or "money in the account," it is reasonable to interpret and understand these terms as referring to the account's official balance—the balance without deducting for pending debit card transactions or holds on deposits.

79.     In its study, the CFPB concluded that when a financial institution creates the "overall impression" that it will determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance deducting pending transactions, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

consumer's decision-making and actions, examiners found the practice to be deceptive." The CFPB

further found that "consumers could not reasonably avoid the fees (given the misimpressions created by

the disclosures)." CFPB, *Supervisory Highlights*, at p. 9 (Winter 2015),

https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf [last viewed

April 22, 2020].

80.     Yet contrary to the Account Agreement, Defendant's policy and practice during the class

period was to ignore whether there was money in the account or a negative balance for purposes of

assessing overdraft or NSF fees. Instead, Defendant assessed overdraft and NSF fees based on the

artificial "available balance," rather than using the actual money in the account as the Account

Agreement required.

81.     A second contract was also required for Defendant to collect overdraft fees on certain

types of transactions. (*See* Opt-in Agreement, Ex. 3.) Further, whether that contract was entered into or

not by members, based on information and belief, Defendant made a concerted effort to have all

members read and review the contract. This contract set forth the standard overdraft policy under a

section entitled: "What You Need to Know About Overdrafts." This document was the most effective,

whether entered into or not, to convey Defendant's overdraft practices. On information and belief, it

was a standalone document in large print that purported to advise the members it contained everything

the members needed to know. This in contrast to the dense legal language buried in the middle of the

Account Agreement. This document specifically stated that an overdraft occurred when there was not

enough money in the account to cover the transaction and Defendant pays it anyway. There was not any

reference to "available balance," holds, or pending transactions having an affect on what constitutes an

overdraft for the standard overdraft policy.

82.     In addition to it advising all members of the standard overdraft practices through the use

of this overdraft-specific contract, Defendant was required by Regulation E to provide this Opt-in

Agreement to Plaintiff and the Class Members to govern the terms under which Defendant was allowed

by Regulation E to assess Plaintiff and the Class Members overdraft fees for ATM and non-recurring

debit card transactions. Specifically, Defendant was required to obtain Plaintiff's and Class Members'

affirmative agreement to the contract before being allowed to charge overdraft fees for these debit card

and ATM transactions.  On information and belief, to the extent that Defendant engaged in a Regulation

E overdraft program, it did not comply with Regulation E's requirements.

83.    Defendant did not have a separate Opt-in Agreement that met the requirements of

Regulation E, including, *inter alia*, an adequate description of Defendant's actual practice for applying

overdraft fees.  Such a description would include a description of the use of an artificial "available

balance" rather than just a "balance" or "money in the account."  Instead Defendant's Opt-in

Agreement, titled "Your Right to Request Debit Card Paid NSF Coverage" and "What You Need to

Know about Overdrafts and Overdraft Fees" stated:  "An overdraft occurs when you do not have enough

money in your account to cover a transaction, but we pay it anyway."  This promise means that

Defendant was not authorized to assess an overdraft fee – because an overdraft had not occurred –

unless there was not enough money in the member's account to cover the transaction (*i.e.* balance), and

Defendant used its *own* money to pay the transaction.  It does not in any way state that there will be

deductions made from the money in the member's account arising from holds placed on pending debit

card transactions to create a different artificial "available balance," nor does it state that holds on

deposits would lower the amount of money in the account and create a "collected available balance" for

purposes of allowing an overdraft fee to be assessed.  It only states that Defendant will look to the actual

balance of the account to determine whether an overdraft has occurred, and will only charge a fee if the

actual balance is negative requiring Defendant to use its own funds to cover the transaction:  "[w]e will

charge you a fee of $28 each time *we pay* an overdraft [which occurs when you do not have enough

money in your account to cover a transaction] (emphasis added).

84.    Defendant's practice of charging overdraft and/or NSF fees, even when there is enough

money in the account to cover a transaction presented for payment is inconsistent with how Opt-in

Agreement expressly describes the circumstances under which overdraft and/or NSF fees are assessed.

Further, because, *inter alia*, the Opt-in Agreement does not describe Defendant's actual overdraft

practice, let alone in a manner which is "clear and readily understandable" as required by 12 C.F.R.

§1005.4(a)(1), the Opt-in Agreement fails to comply with Regulation E's opt-in requirements.

Alternatively, on information and belief, Defendant did not follow additional Regulation E opt-in

requirements and, thus, failed to obtain members' opt-ins (*i.e.* affirmative consent) before charging them

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

overdraft fees for ATM and non-recurring debit transactions, in violation of Regulation E.

85.     Additionally, Defendant's description of fees in its Account Agreement and Fee Schedule, (*see* Fee Schedule, Ex. 4) fails to meet TISA's requirements.  Under TISA, Defendant must specifically authorize the fees it is charging and it must *list the conditions* under which the fee may be imposed.  12 C.F.R. § 707.4(b)(4) (emphasis added).  Further, it must also list the various types of transactions that may be subject to an overdraft.  12 C.F.R. § 707, App. C.

86.     Based on a review of Plaintiff's monthly statements, Defendant uses numerous names for the purported overdraft and NSF fees it charges.  One fee called "Recurring PD NSF Fee" is not identified anywhere in Defendant's Account Agreement or Fee Schedule.  Further, Plaintiff's statements also show "Check Card Paid NSF Fees" but there is no reference to this fee in the NSF Charges section of the Fee Schedule.  These fees are not authorized and cannot be charged because Defendant's disclosures do not list the conditions or the various types of transactions, that can be subject to the fee.  Discovery will be needed to determine if there are other unauthorized fees charged by Defendant.

87.     In a recent Federal Interagency Compliance Discussion regarding improper overdraft fees, the CFPB condemned exactly the conduct Plaintiff challenges in this lawsuit, and called what Defendant is doing here during the relevant class period an "Unfair Practice":



Excerpts from Interagency Overdraft Services Consumer Compliance Discussion Presentation Slides, dated Nov. 9, 2016, https://www.consumercomplianceoutlook.org/outlook-live/2016/interagency-overdraft-services-consumer-compliance-discussion/ [last viewed April 22, 2020].

88.     At the time of the overdrafts and NSF fees that predated the applicable statute of

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

1  limitations, Plaintiff did not and could not have discovered she had been injured or known the actual

2  cause of her injuries, even exercising reasonable diligence.  While Plaintiff understood that she was

3  assessed fees, she did not understand the cause of those fees until within the statute of limitations period

4  because Defendant hid its actual practice from its members by describing a different practice in its

5  contracts and other materials disseminated to its members.  This not only reasonably delayed discovery,

6  but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and

7  additionally equitably estop Defendant.

8      89.    Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as

9  set forth below.

10  **PLAINTIFF HAS BEEN DAMAGED AND HAS STANDING TO BRING THIS LAWSUIT**

11      90.    Plaintiff and the Class Members were harmed by Defendant's policy and practice of

12  charging overdraft or NSF fees when there was money in the account to cover the transaction and other

13  illegal overdraft and NSF practices as set forth here and established in discovery.  By doing so,

14  Defendant breached its contracts with Plaintiff and the absent Class Members and violated regulations

15  and statutes.  It will be necessary to obtain Defendant's records to determine each instance of such a

16  wrongful overdraft or NSF fee.  As just a few examples, on or about July 17, 2018, Plaintiff had a

17  positive balance of $92.43 in her account.  She made a payment in the amount of $60.00, which left her

18  with a positive balance of $32.43.  Yet, Defendant charged Plaintiff a $28.00 "Recurring PD NSF Fee"

19  anyway.  On or about April 4, 2018, Plaintiff had a positive balance of $450.09 in her account.  She

20  made a payment in the amount of $3.34, which left her with a positive balance of $446.75.  Yet,

21  Defendant charged Plaintiff a $28.00 "Recurring PD NSF Fee."  Plaintiff has a reasonable belief that

22  discovery and a complete review of Defendant's records, including Plaintiff's monthly statements and

23  transaction history, will show multiple instances in which Defendant improperly charged Plaintiff

24  overdraft and NSF fees for transactions despite the fact that she had enough money in her account to

25  cover the transactions.

26      91.    Plaintiff was also charged overdraft fees on non-recurring debit card transactions that

27  could only be assessed if Defendant has fully complied with Regulation E in obtaining Plaintiff's

28  affirmative opt-in.  As an example, on April 9, 2019, she received a $28.00 overdraft fee on a Point of

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

1  Sale transaction on a $21.00 transaction that was identified as a "Check Card Fee." Further, there is a

2  question whether Defendant was improperly classifying some transactions as recurring transactions not

3  subject to Regulation E, when in fact these transactions were non-recurring debit card transactions. For

4  instance, on April 4, 2018, Plaintiff was assessed an overdraft fee of $28.00 on a Point of Sale

5  transaction from Thumbtack that was classified as recurring, when it likely did not meet that definition

6  and should have been properly classified as a Regulation E overdraft fee. On April 10, 2019, Plaintiff

7  was assessed a $28.00 "recurring paid NSF fee" on a $13.50 Point of Sale transaction that does not

8  appear to be properly classified as a recurring debit card transaction.

9      92.    Moreover, Defendant's assessment and unilateral taking of improper overdraft and NSF

10 fees further reduced the balance and amount of funds in members' accounts, resulting in and

11 aggressively causing subsequent, otherwise non-overdraft or non-NSF transactions to be improperly

12 treated as transactions for which Defendant assessed further overdraft or NSF fees. This practice was

13 deemed to be deceptive and substantially harmful to customers by the CFPB, which concluded in its

14 studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

*Infra,* Supervisory Highlights, Winter 2015, at pp. 8-9. A complete evaluation of Defendant's records is necessary to determine the full extent of Plaintiff's harm from this practice.

### CLASS ACTION ALLEGATIONS

93.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth

24

herein.

94.    Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2) and (b)(3) on behalf of the following Class.

95.    The "Class" is composed of one of the following:

**The Sufficient Funds Class – Pre-September 2018:**

> **All members of Defendant who have or have had accounts with Defendant who incurred an overdraft fee or NSF fee when the balance in the checking account was sufficient to cover the transaction during the period beginning four years preceding the filing of this Complaint and ending on August 31, 2018.**

**The Sufficient Funds Class – Post September 2018:**

> **All members of Defendant who have or have had accounts with Defendant who incurred an overdraft fee or NSF fee when the balance in the checking account was sufficient to cover the transaction during the period beginning September 1, 2018 and ending on the date the Class is certified.**

**The Regulation E Class:**

> **All members of Defendant who have or have had account with Defendant who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the class period beginning August 15, 2010, and ending on the date the Class is certified.**

**The TISA Class:**

> **All members of Defendant who have been assessed overdraft and NSF fees that were in violation of TISA pursuant to California Unfair Competition Law Business and Professions Code §§ 17200, *et seq.* during the class period beginning four years preceding the filing of this Complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.**

96.    Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

97.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23.

98.    <u>**Numerosity (Federal Rules of Civil Procedure, Rule 23(a)(1))**</u> – The members of the

Class are so numerous that joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with credit unions with similar practices, that the Class is likely to include thousands of members based on the 360,000 members nationwide

99.     Upon information and belief, Defendant has databases, and/or other documentation, of its members' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's members has been harmed by its practices and thus qualify as a Class Member.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

100.    **Commonality (Federal Rules of Civil Procedure, Rule 23(a)(2))**– This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- whether, pursuant to the Account Agreement, Defendant promised to Plaintiff and the Class Members that it would not charge an overdraft or NSF fee when there was enough money in the account to cover the transaction;

- whether, pursuant to the Opt-in Agreement, Defendant promised to Plaintiff and the Class Members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

- whether Defendant breached the Account Agreement by assessing overdraft or NSF fees for transactions when members' accounts contained enough money to cover the transactions;

- whether Defendant breached the Opt-in Agreement by assessing overdraft fees for transactions when members' accounts contained enough money to cover the transaction;

- whether Defendant violated TISA or Regulation E when it assessed overdraft and NSF

26

1    fees on its members;

2    • whether the language of the Opt-in Agreement described Defendant's overdraft service

3        pursuant to which Defendant assessed overdraft fees:

4    • whether the language in the Account Agreement is ambiguous;

5    • whether the language in the Opt-in Agreement is ambiguous;

6    • whether Defendant is liable for breach of the covenant of good faith and fair dealing,

7        unjust enrichment and money had and received; and

8    • whether Defendant's conduct violated state consumer protection laws.

9    101.    **Typicality (Federal Rules of Civil Procedure, Rule 23(a)(3))** – Plaintiff's claims are

10   typical of all Class Members.  The evidence and the legal theories regarding Defendant's alleged

11   wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same

12   because all of the relevant agreements between Defendant and its members were identical as to all

13   relevant terms, and also because, *inter alia*, the challenged practices of charging members for overdraft

14   fees or NSF fees when there were sufficient funds in the accounts to pay for the transactions at issue are

15   uniform for Plaintiff and all Class Members.  Accordingly, in pursuing her own self-interest in litigating

16   her claims, Plaintiff will also serve the interests of the other Class Members.

17   102.    **Adequacy (Federal Rules of Civil Procedure, Rule 23(a)(4))** – Plaintiff will fairly and

18   adequately protect the interests of the Class Members. Plaintiff has retained competent counsel

19   experienced in class action litigation to ensure such protection.  There are no material conflicts between

20   the claims of the representative Plaintiff and the members of the Class that would make class

21   certification inappropriate.  Plaintiff and her counsel intend to prosecute this action vigorously.

22   103.    **Predominance and Superiority (Federal Rules of Civil Procedure, Rule 23(b)(3))** –

23   The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions

24   of law or fact identified herein and to be identified through discovery predominate over questions that

25   may affect only individual Class Members.  Further, the class action is superior to all other available

26   methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the

27   individual Class Members are relatively small, the expense and burden of individual litigation would

28   make it virtually impossible for Plaintiff and Class Members to individually seek redress for

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

Defendant's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

104.    Plaintiff is not aware of any separate litigation instituted by any of the Class Members against Defendant. Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is desirable for this litigation because Defendant's headquarters are located in this District and the claims arose from activities that occurred largely in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

105.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

106.    This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

107.    Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and,

- the difficulties likely to be encountered in the management of a class action.

## **FIRST CAUSE OF ACTION**

### **(Breach of the Account Agreement)**

108.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

109.    Plaintiff and each of the Class Members entered into the Account Agreement, attached hereto as Exhibit 1, with Defendant covering the subject of overdraft and NSF fees.  This contract was drafted by and binding on Defendant.

110.    Among other promises Defendant made in the Account Agreement prior to September 2018, Defendant promised that it would assess overdraft and NSF fees only when there was not "enough money in [a member's] Checking Account to cover the checks . . . or to cover transactions," or when the checking account "does not have sufficient funds."  It further described an overdraft as occurring when an item would "overdraw [an] account," when there was a "negative balance," or when the account

"fall[s] below a zero balance."

111.    Nowhere did the Account Agreement prior to September 2018 explain that Defendant would create an artificial system by which it would deduct pending debit transactions or holds on deposits for purposes of determining whether an account was overdrawn such that an overdraft or NSF fee would be assessed.

112.    Further, the Account Agreement along with the Opt-in Agreement failed to accurately describe the circumstances when Plaintiff and Class Members would be assessed an overdraft fee or NSF fee.

113.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

114.    Defendant breached the terms of the Account Agreement by, *inter alia*, assessing overdraft or NSF fees when there was enough money in the account to cover the transaction.

115.    As a proximate result of Defendant's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### SECOND CAUSE OF ACTION

### (Breach of the Opt-in Agreement)

116.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

117.    Plaintiff and each of the Class Members entered into the Opt-in Agreement with Defendant covering the subject of overdraft and/or NSF fees.  This contract was drafted by and is binding upon Defendant.

118.    In the Opt-in Agreement, Defendant promised that it would assess overdraft and/or NSF fees only when there was not enough money in the account to cover the transaction.

119.    The contract incorporated by reference all applicable laws regarding its subject matter, including 12 C.F.R. § 1005.17, which mandates that all Opt-in Agreements for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the Account Agreement and

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

accurately describe the overdraft fee practice, and bars financial institutions from assessing fees for non-recurring debit card and ATM transactions if they have not fully complied with that section's requirements.

120.    The Opt-in Agreement failed to accurately describe the circumstances when Plaintiff and Class Members would be assessed an overdraft fee or NSF fee.

121.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-in Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

122.    Defendant breached the express terms of the Opt-in Agreement by, *inter alia*, assessing overdraft and/or NSF fees when there was money in the account to cover the transaction or transactions at issue.

123.    As a proximate result of Defendant's breach of the Opt-in Agreement, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

124.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

125.    Plaintiff and each of the Class Members entered into the Account Agreement and Opt-in Agreement with Defendant covering the subject of overdraft and NSF transactions.  The Account Agreement and Opt-in Agreement were drafted by and are binding upon Defendant.  In the agreements, Defendant promised that it would only assess overdraft or NSF fees when there was not enough money in the account to cover the transaction.  Yet it assessed such fees when Plaintiff and Class Members had enough money in the account to cover the transaction.

126.    Further, good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their

terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

127.    The material terms of the Account Agreement and Opt-in Agreement therefore include the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

128.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

129.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing fees when there was enough money in the account to cover the transaction. Defendant could easily have avoided acting in this manner by simply changing the programming in its software to charge overdraft and NSF fees only when there really was not enough money in the account to cover the transaction in question.  Instead, Defendant unilaterally elected to and did program its software to create an accounting gimmick, the artificial "available balance," which would maximize its overdraft and NSF fees.  In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft and NSF fees, Defendant executed its contractual obligations, including any discretion it had, in bad faith, depriving Plaintiff and the Class Members of the full benefit of the Account Agreement.

130.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

**FOURTH CAUSE OF ACTION**

**(Unjust Enrichment/Restitution)**

131.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

132.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

133.    Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit underservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

**FIFTH CAUSE OF ACTION**

**(Money Had and Received)**

134.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

135.    Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

136.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members. Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

**SIXTH CAUSE OF ACTION**

**(Violation of Electronic Fund Transfer Act (Regulation E), 12 C.F.R. §§ 1005, _et seq._  (authority derived from 15 U.S.C. §§ 1693, _et seq._))**

137.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

138.    By charging overdraft fees on ATM and nonrecurring debit transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, _et seq._, whose "primary objective" is "the protection of

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

1    individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic

2    Fund Transfer Act [15 U.S.C. §§ 1693, *et seq.*], the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

3          139.    Specifically, Defendant violated  what is known as the "Opt-in Rule" of Regulation E.

4    12 C.F.R. § 1005.17. The Opt-in Rule states:  "a financial institution . . . shall not assess a fee or

5    charge . . . pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the

6    consumer with a notice in writing [the opt-in notice] . . . describing the institution's overdraft service"

7    and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the

8    overdraft program.  *Id*. The notice "shall be clear and readily understandable."  12 C.F.R. § 1005.4(a)(1).

9    To comply with the affirmative consent requirement, a financial institution must provide a segregated

10   description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to

11   12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after

12   receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R.

13   § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that

14   conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any

15   other feature of the account.

16         140.    The intent and purpose of this Opt-in Agreement is to "assist customers in understanding

17   how overdraft services provided by their institutions operate . . . by explaining the institution's overdraft

18   service . . . in a clear and readily understandable way"—as stated in the Official Staff Commentary, 74

19   Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own

20   regulation," and "warrants deference from the courts unless 'demonstrably irrational,'" and should

21   therefore be treated as "a definitive interpretation" of Regulation E.  *Strubel v. Capital One Bank (USA)*,

22   179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211

23   (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

24         141.    Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires

25   affirmative consent before a financial institution is permitted to assess overdraft fees against members'

26   accounts through an overdraft program for ATM and non-recurring debit card transactions.  Defendant

27   has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its

28   customers in a "clear and readily understandable way" a valid description of the overdraft program

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

which meets the strictures of 12 C.F.R. § 1005.17.  Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but Defendant pays it anyway, when, in fact, Defendant assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.  Further, on information and belief, Defendant fails to meet other requirements necessary for Regulation E opt-in consent.

142.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Class Members.

143.    As the result of Defendant's violation of Regulation E, 12 C.F.R. § 1005.17, Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C.A. § 1693m.

## SEVENTH CAUSE OF ACTION

### (Violation of California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*)

144.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

145.    Defendant's conduct described herein violates California's Unfair Competition Law (the "UCL"), codified at Business and Professions Code § 17200, *et seq*.  The UCL prohibits, and provides civil remedies for, unlawful and unfair competition.  Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.  By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to serve as the basis of an independently actionable unfair competition claim, and sweeps within its scope acts and practices not specifically proscribed by any other law.

146.    The UCL expressly provides for injunctive relief, and contains provisions denoting its public purpose.  A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general.  Although the private litigant controls the litigation of an unfair

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

competition claim, he or she is not entitled to recover compensatory damages for his or her own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme, or restitution to victims of the unfair competition.

147.    As further alleged herein, Defendant's conduct violates the UCL's "unfair" prong insofar as Defendant charges overdraft or NSF fees when there is enough money in an account to cover a transaction, in violation of the public policy and/or text of TISA and/or Regulation E. Defendant's conduct was not motivated by any legitimate business or economic need or rationale.  The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.  The harm to Plaintiff and Class Members arising from Defendant's unfair practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

148.    Defendant's unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members, and the general public.  Defendant's conduct was substantially injurious to consumers in that they have been forced to pay improper, abusive, and/or unconscionable NSF or overdraft fees.

149.    Moreover, Defendant's conduct also violates the UCL's unlawful prong to the extent Defendant violated Regulation E and TISA by failing to accurately describe the circumstances when Plaintiff and Class Members would be assessed an overdraft fee and/or NSF fee.

150.    By charging overdraft fees on ATM and nonrecurring transactions, Defendant violated Regulation E, 12 C.F.R. § 1005 *et seq.*  Such charges violated what is known as the "Opt-in Rule" of Regulation E.  12 C.F.R. §1005.17.  The Opt-in Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  *Id.* (emphasis added.)  The notice "shall be clear and readily understandable."  12 C.F.R. §1005.4(a)(1).

151.    To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

152. Defendant has violated the unlawful prong of California's UCL as a result of violating Regulation E's prohibitions against using an Opt-in Agreement that misinformed members about both the standard overdraft policies and the Regulation E specific overdraft policies by falsely stating that overdrafts were assessed only when there was not enough money to cover the transaction (actual "balance") when instead the Defendant used the bookkeeping artificial "available balance" to assess overdraft fees.

153. In addition, under TISA, credit union disclosures must be presented in a format allowing members to readily review the terms of the account and use consistent terminology to describe terms, which includes the overdraft terms in the account disclosure, fee agreement and monthly statements. 12 C.F.R. § 707.3. When a credit union promotes the payment of overdrafts in advertisements, it must do so accurately, clearly, and conspicuously. 12 C.F.R. § 707.8; 12 C.F.R. § 707.11 (b). Further, in its account disclosure, a credit union must specifically authorize the fee it is charging, 12 C.F.R. § 707.4(b)(4), and it must *list the conditions* under which the fee may be imposed. *Id*. (emphasis added). It must also list the various type of transactions that may be subject to an overdraft. 12 C.F.R. § 707, App. C.

154. Defendant has violated the unlawful prong of California's UCL as a result of violating TISA by, among other things, providing inaccurate disclosures and agreements and failing to clearly and conspicuously identify its true overdraft practices and fees.

155. As a result of Defendant's violations of the UCL, Plaintiff and Class Members have paid improper NSF and overdraft fees and thereby have suffered actual loss of money. Absent injunctive relief forcing Defendant to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting Defendant from misrepresenting and omitting material information concerning its NSF and overdraft fee policy at issue in this action in the future, Plaintiff and other existing accountholders, and the general public, will suffer from and be exposed to Defendant's conduct violative of the UCL.

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

## **PRAYER**

WHEREFORE, PLAINTIFF and CLASS MEMBERS pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For statutory damages;

5.    For an order enjoining the wrongful conduct alleged herein;

6.    For costs;

7.    For pre-judgment and post-judgment interest as provided by law;

8.    For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

9.    For such other relief as the Court deems just and proper.

DATED:  May 1, 2020                          Respectfully submitted,

                                             MCCUNE WRIGHT AREVALO, LLP

                                      By:    _/s/ *Richard D. McCune*_____
                                             Richard D. McCune, CA Bar No. 132124
                                             rdm@mccunewright.com
                                             David C. Wright, CA Bar No. 177468
                                             dcw@mccunewright.com
                                             McCUNE WRIGHT AREVALO, LLP
                                             3281 East Guasti Road, Suite 100
                                             Ontario, California 91761
                                             Telephone: (909) 557-1250
                                             Facsimile: (909) 557-1275

                                             Emily J. Kirk, IL Bar No. 6275282*
                                             ejk@mccunewright.com
                                             McCUNE WRIGHT AREVALO, LLP
                                             231 N. Main Street, Suite 20
                                             Edwardsville, IL 62025
                                             Telephone:  (618) 307-6116
                                             Facsimile:  (618) 307-6161

                                             Attorneys for DANIELLA A. CAVENEY,
                                             individually, and on behalf of all others similarly
                                             situated

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No:

*Pro Hac Vice* application to be submitted

## **DEMAND FOR JURY TRIAL**

PLAINTIFF, on behalf of herself and all others similarly situated, demands a jury trial with respect to all issue triable of right by jury.

DATED:  May 1, 2020                                   Respectfully submitted,

MCCUNE WRIGHT AREVALO, LLP


By:   /s/ *Richard D. McCune*
      Richard D. McCune, CA Bar No. 132124
      rdm@mccunewright.com
      David C. Wright, CA Bar No. 177468
      dcw@mccunewright.com
      McCUNE WRIGHT AREVALO, LLP
      3281 East Guasti Road, Suite 100
      Ontario, California 91761
      Telephone: (909) 557-1250
      Facsimile: (909) 557-1275

      Emily J. Kirk, IL Bar No. 6275282*
      ejk@mccunewright.com
      McCUNE WRIGHT AREVALO, LLP
      231 N. Main Street, Suite 20
      Edwardsville, IL 62025
      Telephone:  (618) 307-6116
      Facsimile:  (618) 307-6161

      Attorneys for DANIELLA A. CAVENEY,
      individually, and on behalf of all others similarly
      situated

      *Pro Hac Vice* application to be submitted

CLASS ACTION COMPLAINT FOR DAMAGES AND OTHER RELIEF
Case No: